UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION


CAROLYN M. NEEDHAM,

        Plaintiff,

    v.

COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

3:16-cv-01380-YY

FINDINGS AND
RECOMMENDATION


YOU, Magistrate Judge:

## <u>INTRODUCTION</u>

Plaintiff, Carolyn M. Needham ("Needham"), seeks judicial review of the final

decision by the Commissioner of Social Security ("Commissioner")[1] denying her

applications for Disability Insurance Benefits ("DIB") under Title II of the Social Security

Act ("SSA"), 42 U.S.C. §§ 401-433, and Supplemental Security Income ("SSI") under Title

XVI of the SSA, 42 U.S.C. §§ 1381-1383f. This court has jurisdiction to review the

Commissioner's decision pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3). For the reasons

---

[1] The official title of the head of the Social Security Administration, and the proper named
defendant in this case, is the "Commissioner of Social Security." 42 U.S.C. § 902(a)(1).

below, the Commissioner's decision should be REVERSED and this case REMANDED for immediate calculation and payment of benefits.

## ADMINISTRATIVE HISTORY

Needham protectively filed for DIB and SSI on May 29, 2012, alleging a disability onset date of October 1, 2009. Tr. 21, 261–72, 327.[2] Her applications were denied initially and on reconsideration. Tr. 205–219. On June 24, 2014, a hearing was held before Administrative Law Judge ("ALJ") Dan Hyatt. Tr. 45–62. The ALJ issued a decision on July 25, 2014, finding Needham not disabled. Tr. 21–35. The Appeals Council denied a request for review on June 8, 2016. Tr. 1–3. Therefore, the ALJ's decision is the Commissioner's final decision subject to review by this court. 20 C.F.R. §§ 404.981, 416.1481, 422.210.

## BACKGROUND

Born in April 1985, Needham was 29 years old at the time of the hearing before the ALJ. Tr. 64. Needham was identified as a student with reading difficulties in the second grade and was on an Individualized Educational Plan ("IEP") until her graduation from high school in 2004. Tr. 467. She has no past relevant work at the level of substantial gainful activity, although she has worked part-time in the past, including unsuccessful attempts to work during the period under review. Tr. 47-50, 332. Needham alleges she is unable to work due to Wolff-Parkinson-White ("WPW") syndrome, hypertension, migraines, learning disorder, and posttraumatic stress disorder ("PTSD"). Tr. 331.

---

[2] Citations are to the page(s) indicated in the official transcript of the record filed on November 30, 2016 (ECF #13).

## MEDICAL EVIDENCE

On October 8, 2009, Needham was seen for worsening hypertension during pregnancy. Tr. 527. On October 26, 2009, just days after the birth of her third child, Needham was seen in an emergency room ("ER") with a severe frontal headache. Tr. 694-95. After administration of intravenous ("IV") morphine, Needham was discharged home.

On March 23, 2010, Needham again sought treatment in the ER for hypertension and a migraine. Tr. 680-82. Her blood pressure at admission was 174/113. Tr. 680. After IV administration of Zofran and Dilaudid, she was discharged home, with prescriptions for Vicodin, as needed for pain, Phenergan, as needed for nausea, and a daily dose of 80 mg. of Propranolol to address her hypertension. *Id.* She was also instructed to have an "emergent reevaluation." Tr. 681.

On April 27, 2010, Steven P. Barry, Ph.D., evaluated Needham and produced a "Learning Disability Evaluation Report." Tr. 465-77. At the time Dr. Barry interviewed her, Needham was homeless and living in a motel with her boyfriend and three daughters. Tr. 466. Dr. Barry administered a battery of tests including the Wechsler Adult Intelligence Scale-IV ("WAIS-IV"), Woodcock Reading Mastery Tests, and Scholastic Abilities Test for Adults. Tr. 471-74. On the WAIS-IV, Needham was "borderline" in verbal comprehension and working memory, with scores in the 5th and 4th percentile, respectively. Tr. 471. She scored "low average" in perceptual reasoning (14th percentile), and "average" in processing speed (34th percentile). *Id.* In the Woodcock Reading tests, Needham scored in the 6th percentile in the "total reading cluster," a combination of all the subtests. Tr. 473. In the Scholastic Abilities test, Needham scored in the poor to very poor range for reading. Tr.

474.  Dr. Barry opined Needham has a reading disorder, and would need extra time filling out applications and verbal rather than written reminders for deadlines.  Tr. 476.

On June 13, 2010, Needham presented at the ER with a migraine.  Tr. 482–83.  She was treated with pain and nausea medication, and released that day.  *Id*.  She was pregnant with her fourth child, and experiencing the "acute cephalgia typical for her migraine."  Tr. 483.  Four months later, on October 28, 2010, Needham was admitted to the hospital to monitor headaches that were unresponsive to Tylenol.  Tr. 569.  She was released two days later and prescribed Fioricet for the headaches.  Tr. 570.

On November 4, 2010, Needham was admitted to the hospital with elevated blood pressure and complaints of a headache lasting two weeks.  Tr. 564-65.  She was monitored for severe high blood pressure and severe fetal intrauterine growth restriction for nearly a week.  *Id*.  She delivered a stillborn daughter on November 10, 2010.  Tr. 565.  Needham was released home the next day, with prescriptions for Ibuprofen, Acetaminophen, and Oxycodone for pain.  *Id.*

In mid-January 2011, Needham established care at Virginia Garcia Memorial Health Center.  Tr. 769.  At that time, she reported having 2-3 migraines weekly at an 8/9 level of severity.  *Id*.  She had high blood pressure (158/105) and was struggling with depression, worsening headaches, and insomnia.  Tr. 770–71.  The treating doctor prescribed a blood pressure kit for home monitoring, Labetelol (for hypertension), Sumatriptan, described as a "migraine abortive agent," to be taken at the onset of a headache, Zoloft (for depression), and Trazodone (for insomnia).  Tr. 769–71, 783.

By February 2011, Needham was experiencing symptoms of PTSD associated with her daughter's death.  Tr. 763-64.  K. Christopher Hall, PA-C ("Hall") prescribed EMDR

(Eye Movement Desensitization and Reprocessing) treatment to "try and get quick resolution of flashbacks," as well as relaxation exercises and stress management strategies to help her control the impact of her negative feelings. *Id*. The hope was that reducing Needham's PTSD symptoms would improve management of her hypertension, pain from headaches, and insomnia. *Id*.

On March 17, 2011, Hall provided Needham with a letter stating that she was unable to work due to post-partum depression, uncontrolled hypertension, and headaches, which would "continue until further notice." Tr. 621.

Despite this new treatment modality, by the end of that month, Needham's migraine frequency had increased, and she was experiencing heart palpitations and chest tightness. Tr. 757. Due to her "many overlapping issues," she was referred for a cardiology evaluation for medication management. Tr. 757.

Needham was treated in the ER on May 6 and May 25, 2011, for migraines. Tr. 673-74, 784-89. At the latter ER visit, she reported an increase in the frequency of her migraines since beginning Zoloft, as well as palpitations that morning. Tr. 673. The following day, John McAnulty, M.D., a cardiologist with the Legacy Medical Group Heart Rhythm Clinic, evaluated Needham. Tr. 622. She reported heart palpitations followed by migraine headaches and nausea. *Id*. Dr. McAnulty indicated that Needham's "[s]pells were "possibly supraventricular tachycardia episodes given her history of WPW and some response to vagal episodes in the past" and planned further follow up with a rhythm event monitor and possible workup of her hypertension as an "independent variable." Tr. 623.

Needham again sought treatment for migraines at the ER on June 7, June 19, and July 14, 2011.  Tr. 667–68, 670–71, 798–803.  She was stabilized with IV fluids and painkillers, and released.

In late July 2011, Dr. McAnulty prescribed Propranolol for migraines.  Tr. 636.  On September 10, November 8, and November 11, 2011, Needham presented in the ER with a migraine.  Tr. 649–51, 653–54, 664–66.  She was treated with an IV and pain medication, and discharged.

Needham began treatment at the Old Town Clinic on February 17, 2012.  Tr. 913–17.  At that point, she was having migraines twice per week.  *Id.*  Dr. Zeigler diagnosed depression, hypertension, migraine NOS.  Tr. 915.  Two days later, Needham presented at the ER with a migraine and associated nausea and vomiting.  Tr. 645–47.  Needham continued to experience weekly migraines, but attempted (reportedly for the third time) to return to work.  Tr. 895, 899.  By mid-April, she was experiencing three-or-four weekly migraines, and had been let go from her job after calling in three times due to migraines.  Tr. 895.

Needham underwent a neurological examination with Kevin J. Jamison, M.D., on May 8, 2012.  Tr. 804–06.  Dr. Jamison recounted Needham's years-long efforts to treat her migraines with medication and noted she was experiencing migraines two to three times per week.  *Id*.  Needham's migraines had "no clear trigger," but were sometimes preceded by heart palpitations.  Tr. 804.  She began taking Topomax in February 2012, and had managed to avoid returning to the ER since then.  *Id.*  Dr. Jamison assessed "[i]ntractable, long-standing, frequent migraine without aura . . . at least 12 or more per month."  Tr. 806.

Needham was advised to reduce caffeine and sugar intake, and advised to increase Topomax to prevent headaches.  *Id.*

Needham underwent a brain/head MRI on May 21, 2012, which was interpreted as normal aside from bilateral maxillary sinusitis.  Tr. 808.  Two days later, she presented in the ER with another migraine.  She was hyperventilating and had bilateral carpal spasms.  Tr. 809–11.  She was given an IV of pain medication.  Tr. 811.  Within two more days, Needham was again back at the ER with a migraine.  Tr. 885.  Needham reported that the frequency and severity of her migraines was not decreasing despite being on the maximum dose of Tompamax,  Tr. 886.

At a follow-up appointment on June 20, 2012, Needham reported that Topamax was not helping with her migraines.  Tr. 881.  After consulting with Dr. McAnulty, Needham's doctor at the Old Town Clinic ordered her to phase off of Topamax and restart Propranolol at a low dose, despite a prior trial with a beta-blocker that caused heart palpitations.  Tr. 882.

Barbara J. Hills, M.D. performed a second[3] neurological examination of Needham on July 2, 2012.  Tr. 1025.  Needham was continuing to experience migraines two or three days per week.  *Id.*  Because Topomax had not been beneficial, Dr. Hills recommended Propranolol (with increased dosage once safety established) and Trazadone, and noted Needham wears a cardiac monitor.  *Id.*  Needham returned to Dr. Hills on August 2, 2012.  Tr. 1028.  Needham reported three migraines in late July 2012, which were helped with

---

[3]  Dr. Hills' evaluation states that she conducted a neurological evaluation of Needham in 2002, but that evaluation does not appear in the record.

Imitrex injections.  *Id*.  The Trazadone had not helped, and Dr. Hills was considering increasing the dosage of that drug.  *Id*.

Needham underwent a cardiology evaluation on August 23, 2012.  Tr. 832-35. Robert Quintos, M.D., found that her symptoms of "episodic, rapid palpitations" were of "unclear etiology" and "only correlate with sinus tachycardia."  Tr. 834.  Despite Needham's diagnosis with WPW 20 years prior, Dr. Quintos did not believe the symptoms represented an underlying dysrhythmia or WPW.  *Id*.  After ruling out structural heart disease, Dr. Quintos planned to consider additional intervention for inappropriate sinus tachycardia.  Tr. 835.

On August 27, 2012, Sandra Jones, N.D., LA-c, found Needham "unable to work or pursue work or attend work related training" due to chronic migraines, which was not expected to change "for at least the next month."  Tr. 924.

An echocardiogram of August 31, 2012, was interpreted as normal aside from a decreased left ventricular ejection function.  Tr. 836.  On October 12, 2012, Needham underwent a psychological evaluation by Rebecca T. Hill, PMHNP-BC.  Tr. 845-46. Needham was suffering from "extreme depression," which she related to her the loss of her stillborn daughter.  Ms. Hill felt Needham's migraines were exacerbated by her depression and lack of sleep.  Tr. 846.  She referred Needham to therapy and to a grief support group, and discussed possibly increasing her Zoloft prescription.  *Id*.

By November 2, 2012, Needham's headaches remained "[out] of control."  Tr. 1031. Dr. Hills planned to start Gabapentin, initially at 300 mg. per day, increasing weekly up to 900 mg. per day.  *Id*.

At a follow up with Dr. Zeigler on November 16, 2012, Needham reported that she was still having two migraines per week. Tr. 878. Dr. Zeigler found "definite objective improvement" because Needham had not been to the ER since June. Tr. 879. On the same day, Dr. Zeigler provided a note indicating that Needham was "unable to work or pursue work or attend work related training" due to chronic migraines. Tr. 925. It was further noted the migraines were "severe and often prevent her from doing activities of daily living for a day or two at a time." *Id.* Dr. Zeigler did not expect improvement for "at least the next several months." *Id.*

In late March 2013, Needham reported experiencing some decrease in the frequency of her migraines after taking Firocet and Gabapentin (Neurontin). Tr. 1068, 1070. However, at an ER admission in January 2013, and regular prenatal appointments between February and July 2013, Needham continued to report migraines at least weekly. Tr. 974–78 (ER visit 1/3/2013; migraines twice a week), 1072–74 (2/27/2013 office visit; migraines twice a week, lasting 1–2 days), 1070–71 (3/28/2013 office visit; improvement with Firocet and Gabapentin; migraines "down to 1x/week"), 1064–66 (5/23/2013 office visit; migraines once a week), 1062 (5/28/2013 office visit; "[c]ontinues to have left sided headaches"), 1059 (6/6/2013 office visit; headaches once weekly); 1056 (6/12/2013 office visit; weekly migraine headaches), 1054 (6/17/2013 office visit; headache once weekly), 1052 (6/21/2013 office visit; no headaches "other than her typical migraine"), 1044 (7/2/2013 office visit; "has a history of migraines, and denies any changes in this"). In mid-February 2014, Needham was seen in the ER twice to address a "typical migraine," with symptoms of light sensitivity, nausea, and vomiting, that lasted upwards of a week. Tr. 1087. Needham reported that her migraines occurred 2-3 times weekly, until she began taking Gabapentin,

and since then were "[a]veraging once a week," which is the "norm for her" on Gabapentin. Tr. 1094–99.

Dr. Hills examined Needham on February 24, 2014.  Tr. 1083–84.  Needham "had been able to avoid ED visits" until a week earlier, but ran out of her Gabapentin which "likely triggered" the migraine resulting in her ER admission.  Tr. 1083.

## DISABILITY ANALYSIS

Disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act.  20 C.F.R. §§ 404.1520, 416.920; *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

At step one, the ALJ determines if the claimant is performing substantial gainful activity.  If so, the claimant is not disabled.  20 C.F.R. §§ 404.1520(a)(4)(i) & (b), 416.920(a)(4)(i) & (b).

At step two, the ALJ determines if the claimant has "a severe medically determinable physical or mental impairment" that meets the 12-month durational requirement.  20 C.F.R. §§ 404.1520(a)(4)(ii) & (c), 416.909, 416.920(a)(4)(ii) & (c).  Absent a severe impairment, the claimant is not disabled.  *Id*.

At step three, the ALJ determines whether the severe impairment meets or equals an impairment "listed" in the regulations.  20 C.F.R. § § 404.1520(a)(4)(iii) & (d), 416.920(a)(4)(iii) & (d); 20 CFR Pt. 404, Subpt. P, App. 1 (Listing of Impairments).  If the

impairment is determined to meet or equal a listed impairment, then the claimant is disabled.

If adjudication proceeds beyond step three, the ALJ must first evaluate medical and other relevant evidence in assessing the claimant's residual functional capacity ("RFC"). The claimant's RFC is an assessment of work-related activities the claimant may still perform on a regular and continuing basis, despite the limitations imposed by his or her impairments. 20 C.F.R. §§ 404.1520(e), 416.920(e); Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 (July 2, 1996).

At step four, the ALJ uses the RFC to determine if the claimant can perform past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv) & (e), 416.920(a)(4)(iv) & (e). If the claimant cannot perform past relevant work, then at step five, the ALJ must determine if the claimant can perform other work in the national economy. 20 C.F.R. §§ 404.1520(a)(4)(v) & (g), 416.920(a)(4)(v) & (g); *Bowen v. Yuckert*, 482 U.S. 137, 142 (1987); *Tackett*, 180 F.3d at 1099.

The initial burden of establishing disability rests upon the claimant. *Tackett*, 180 F.3d at 1098. If the process reaches step five, the burden shifts to the Commissioner to show that jobs exist in the national economy within the claimant's RFC. *Id.* If the Commissioner meets this burden, then the claimant is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(v) & (g), 416.920(a)(4)(v) & (g), 416.960(c).

## **ALJ'S FINDINGS**

At step one, the ALJ concluded that Needham had not engaged in substantial gainful activity since October 1, 2009, the alleged onset date of disability. Tr. 23. He further

determined that Needham met the insured status requirements of Title II of the Act through March 31, 2010. *Id.*

At step two, the ALJ determined that Needham has the following severe impairments: migraine headaches, learning disorder (reading), PTSD, and depression. *Id.* He further found the non-severe impairments of hypertension and WPW Syndrome. Tr. 24.

At step three, the ALJ concluded that Needham does not have an impairment or combination of impairments that meets or equals any listed impairment. Tr. 25. The ALJ found that Needham has the RFC to perform a full range of work at all exertion levels, with the following non-exertional limitations: "no reading, occasional interaction with the public, [and] frequent interaction with co-workers. She can perform simple, repetitive tasks." Tr. 27.

The ALJ determined at step four that Needham had no past relevant work. Tr. 33.

At step five, the ALJ found that considering Needham's age, education, and RFC, she was capable of performing the occupations of hand packager and room cleaner. Tr. 34.

Accordingly, the ALJ determined that Needham was not disabled at any time from October 1, 2009 through the date of the decision.

## STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007). This court must weigh the evidence that supports and detracts from the ALJ's conclusion. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citing *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998)). The reviewing court may not substitute its judgment for that of the Commissioner.

*Ryan v. Comm'r of Soc. Sec. Admin.*, 528 F.3d 1194, 1205 (9th Cir. 2008) (citing *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007)); *see also Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001). Where the evidence is susceptible to more than one rational interpretation, the Commissioner's decision must be upheld if it is "'supported by inferences reasonably drawn from the record.'" *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (quoting *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004)); *see also Lingenfelter*, 504 F.3d at 1035.

## **DISCUSSION**

Needham challenges the evaluation of (1) her symptom testimony; (2) the medical opinion of treating physician Dr. Zeigler; (3) the statement of Needham's mother, lay witness, Frances Peters ("Peters"); (4) the ALJ's failure to find her migraine headaches met a listing at step two; and (5) the RFC formulation.

## I.     **Needham's Symptom Testimony**

The Act allows consideration of a claimant's symptom testimony. Pain allegations must correspond to a medical impairment "which could reasonably be expected to produce the pain or other symptoms alleged . . . ." 42 U.S.C. § 423(d)(5)(A). The regulations subsequently direct the Commissioner to consider a claimant's statements regarding her symptoms. 20 C.F.R. §§ 404.1529(a); 416.929(a). The Ninth Circuit directs a two-step process in evaluating a claimant's pain and symptom testimony. First, the ALJ determines "whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce pain or other symptoms alleged." *Lingenfelter*, 504 F.3d at 1036. Second, absent evidence of malingering, the ALJ may conclusively reject a claimant's testimony as to the severity of her symptoms by offering "specific, clear and convincing reasons for doing

so." *Brown-Hunter v. Colvin*, 806 F.3d, 487, 493 (9th Cir. 2015) (citing *Burrell v. Colvin*, 775 F.3d 1133, 1136–37 (9th Cir. 2014)). Such findings must be "'sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony.'" *Id.* (quoting *Bunnell v. Sullivan*, 947 F.3d 341, 345–46 (9th Cir. 1991) (*en banc*))

In her application materials and hearing testimony, Needham alleged that she is significantly impaired by frequent and chronic migraine headaches. She explained that she has experienced severe migraines for years, and that the migraines incapacitate her due to pain and nausea, sometimes for days at a time. Tr. 58. She described a history of having many migraines per month, and that even though her present medication regimen helps to a degree, she continues to experience about one migraine per week. Tr. 55, 59. She attributed her inability to maintain employment due to absences caused by migraines and difficulty with concentration and persistence. Tr. 55, 58-59. Needham also testified that when she is having a migraine, she is unable to care for her children because she is essentially relegated to lying in bed. Tr. 52.

Needham assigns error to each of the several reasons the ALJ provided for discounting her credibility regarding the nature and severity of her symptoms. The ALJ found that Needham had "described daily activities that are not limited to the extent one would expect[,]" such as self-care, shopping, and "providing" for her children. Tr. 32. An ALJ may consider a claimant's activities of daily living ("ADLs") in assessing whether those activities contradict her testimony about symptoms or functional limitations, or in assessing whether those activities represent functional capacities that are transferable to the workplace. *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007). However, in this case the ALJ's finding is completely unsupported, other than his boilerplate assertion that the ADLs were "inconsistent with the level of severity alleged." *Id.* The ALJ failed to identify any contradictory testimony presented by Needham. Although

Needham testified that when she is having a migraine she has difficulty with the activities the ALJ alluded to, Needham did not state that she was completely precluded from such activities all the time. As the Ninth Circuit has long-since established, the ALJ's generalized assertion falls well short of the clear-and-convincing legal standard. *See Orn*, 495 F.3d at 639 (minimal activities do not necessarily contradict allegations of disability); *Reddick*, 157 F.3d at 722 ("[G]eneral findings are insufficient . . . the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints."). The ALJ's finding is legally inadequate.

The ALJ also found that Needham's symptom allegations lacked credibility because she "worked only sporadically prior to the alleged disability onset date, which raises a question about whether the claimant's continuing unemployment is actually due to medical impairments." Tr. 33. The Commissioner asserts the ALJ's rationale was valid because an ALJ may consider "an extremely poor work history" as illustrative of "show[ing] little propensity to work." Def.'s Br. 8-9. However, the clear-and-convincing standard still applies, and with it, the requirement that the ALJ identify specific testimony that the evidence purportedly contradicts. *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002). Again, the ALJ does not identify what symptom allegations are purportedly contradicted by Needham's work history or continuing unemployment: Does the ALJ mean that Needham's migraines are not as severe as alleged? Does the ALJ mean that Needham's migraines are not as frequent as alleged? Does the ALJ mean that Needham is a malingerer? The ALJ's meager explanation leaves this court to guess. And where the court is left to guess what an ALJ's finding refers to, the clear-and-convincing legal threshold is categorically unmet. *See Reddick*, 157 F.3d at 722.

Upon review of the record as a whole, this court finds that Needham's testimony about being able to acquire employment at times, but being unable to sustain employment is completely consistent with her testimony about her migraines. Further, the ALJ's assertion that Needham has shown only sporadic work history is undercut by the fact that she was only five years out of high school at her alleged onset date, and her testimony regarding her jobs appears completely consistent with the record. *See* Tr. 28, 467 (graduated high school in 2004; first record of migraine in 2009). The record unequivocally reflects that despite her desire to continue working at a Safeway bakery, Needham was terminated because her migraines caused her to miss too much work. Tr. 804. In short, the ALJ's reasoning falls well short of the exacting clear-and-convincing threshold.

The ALJ also cited "inconsistent information" Needham provided to consultative examiner Dr. Barry in April 2010. Tr. 33. The ALJ asserted that, although Needham's statement "may not be the result of a conscious intention to mislead," he discredited Needham for inconsistently telling Dr. Barry that she could not finish culinary school because "her ex-husband would not watch their children," but "later claimed" her inability to finish was due to concentration problems associated with migraines. *Id.*; *see* Tr. 468. However, the ALJ did not identify any specific testimony to support his finding and nothing in the record supports the conclusion that Needham made the latter statement that the ALJ attributed to her. Instead, the only other statements regarding Needham's difficulties during the time she attended culinary school appear to be those from Needham's mother, Peters. In a Third Party Function Report dated August 18, 2010, three years after Needham's April 2007 culinary classes, Peters stated that Needham "couldn't keep up the pace" in culinary school. Tr. 298. Later, in a letter dated June 14, 2014, Peters explained Needham's increasing migraine frequency while attending

culinary school, which Peters attributed to increased migraine triggers in the form of the noise, light, and diesel fumes associated with the public transit Needham was taking to get to classes. Tr. 435. Because it is not supported by a statement Needham herself made, the ALJ's rationale does not meet the clear-and-convincing legal standard. *Reddick*, 157 F.3d at 722.

The Commissioner urges this court to find that the ALJ, reasonably concluded that Dr. Barry's statement that Needham "withheld her history of reading problems from the school" (Tr. 468) amounted to Needham telling him "that her reading problems prevented her from continuing in this program." Def's Brf., p. 8, citing Tr. 29, 468. However, again, Dr. Barry's report does not indicate that Needham attributed her inability to continue to her reading problems. In any event, the court is constrained to review only the grounds invoked by the ALJ, and may not affirm the non-disability decision based on the Commissioner's *post-hoc* rationales. *Burrell*, 775 F.3d at 1141 (citations omitted). The ALJ's finding is deficient.

The ALJ further discredited Needham's symptom allegations based on a theory of conservative treatment. *See* Tr. 33. The ALJ articulated the rationale in a variety of ways, but none are clear and convincing. For example, the ALJ noted that although Needham "has visited emergency departments frequently, [] she has not received the type of medical treatment one would expect for a totally disabled individual." Tr. 33. That statement is essentially meaningless. There is no "typical medical treatment" that "totally disabled individuals" receive. Even if the ALJ were given the benefit of the doubt, he fails to identify what type of treatment "one would expect" an individual with Needham's constellation of severe impairments would receive if he or she were "totally disabled." Instead, the ALJ's bare assertion stands alone, vague and unsupported. The finding is wholly inadequate given the applicable legal standard. Moreover, there is no dispute that Needham continued to occasionally receive emergency room

treatment until months before the hearing, and even when Needham did not seek emergency treatment, she continued to report frequent migraines to medical providers. The Commissioner's argument that Needham was often discharged pain-free after an ER visit does not address Needham's assertions that she is incapacitated when she has a migraine (and sometimes for days afterward), nor does it address Needham's allegations of the frequency of her migraines.

The ALJ further supported his conservative treatment finding with a convoluted discussion of Needham's medication regimen. First, the ALJ asserted that Needham took "appropriate medications" for her impairments, "which weigh[ed] in claimant's favor," but then found "there is also evidence that . . . [Needham] has not been entirely compliant in taking prescribed medications." Tr. 33. The ALJ also noted that when Needham was compliant, her medications were "relatively effective" in treating her symptoms. Although Needham concedes that she has not always been compliant for a variety of reasons including losing her insurance, there is no dispute that even when Needham is compliant, she suffers migraines about once per week. *See* Tr. 1083. As such, the ALJ's finding is somewhat internally inconsistent, but more importantly, does not illustrate that when Needham is compliant, her medications would allow her to sustain employment. Indeed, the VE testified that a hypothetical worker could not be absent more than twice per month and sustain employment; accepting Needham has four migraines per month when taking her "relatively effective" medications properly, it is likely she would still exceed the acceptable number of absences. Medical notes suggesting improvement should be viewed cautiously: "that a person . . . makes some improvement does not mean that the person's impairments no longer seriously affect her ability to function in the workplace." *Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014) (citing *Holohan v. Massanari*, 246 F.3d 1195, 1205 (9th Cir. 2001)). Here, Needham admitted she was not always compliant, provided

some valid rationales why that was so, and further explained without contradiction that despite her medications, she still suffered from weekly debilitating migraines. Thus, viewing the record as a whole, and considering that the ALJ appears to have accepted Needham's allegation of continuing to have one migraine per week despite using appropriate medication, the ALJ's finding that the efficacy of Needham's treatments constituted a reason to discredit her symptom allegations is not clear and convincing.

Finally, the ALJ appears to impugn Needham's symptom testimony for lack of objective medical evidence. The ALJ asserted that he "has not rejected the claimant's statements . . . solely because the available objective medical evidence does not substantiate the statements." Tr. 32. The ALJ further explained that he considered all of the symptom allegations and reports that could "reasonably be accepted as consistent with the objective medical evidence and other evidence[.]" *Id.* To the degree the ALJ is asserting that he found credible only the statements that could reasonably be expected as consistent with the objective evidence, the rationale is vague at best, as therefore does not rise to the clear-and-convincing level. Further, as the ALJ's other rationales are erroneous, the rationale that Needham's symptom allegations are not consistent with the objective evidence is insufficient to support a negative credibility finding on its own. *Reddick*, 157 F.3d at 722. For all of the foregoing reasons, the ALJ's assessment of Needham's symptom testimony should be reversed.

## II. Medical Opinion Evidence

Needham next assigns error to the ALJ's assessment of the medical opinion of treating physician Claire Zeigler, M.D. The Ninth Circuit distinguishes between the opinions of three types of physicians: treating physicians, examining physicians, and non-examining physicians. Generally, "a treating physician's opinion carries more weight than an examining physician's,

and an examining physician's opinion carries more weight than a reviewing physician's."
*Holohan*, 246 F.3d at 1202 (citation omitted).  If a treating physician's opinion is supported by
medically acceptable techniques and is not inconsistent with other substantial evidence in the
record, the treating physician's opinion is given controlling weight.  *Id.*; *see also* 20 C.F.R.
§§ 404.1527(c)(2), 416.927(c)(2).  A treating doctor's opinion that is not contradicted by the
opinion of another physician can be rejected only for "clear and convincing" reasons.  *Ryan*, 528
F.3d at 1198 (citation omitted).  If a treating doctor's opinion is contradicted by the opinion of
another physician, the ALJ must provide "specific and legitimate reasons" for discrediting the
treating doctor's opinion.  *Id* (citation omitted).

In addition, the ALJ generally must accord greater weight to the opinion of an examining
physician than that of a non-examining physician.  *Orn*, 495 F.3d at 631 (citation omitted).  As is
the case with the opinion of a treating physician, the ALJ must provide "'clear and convincing'"
reasons for rejecting the uncontradicted opinion of an examining physician.  *Hill v. Astrue*, 698
F.3d 1153, 1159-60 (9th Cir. 2012) (quoting *Regennitter v. Comm'r*, 166 F.3d 1153, 1159–60
(9th Cir. 1999)).  If the opinion of an examining physician is contradicted by another physician's
opinion, the ALJ must provide "'specific and legitimate reasons'" for discrediting the examining
physician's opinion.  *Id*  (quoting *Regennitter*, 166 F.3d 1153 at 1160)).  An ALJ may reject an
examining, non-treating physician's opinion "in favor of a nonexamining, nontreating physician
when he gives specific, legitimate reasons for doing so, and those reasons are supported by
substantial record evidence."  *Roberts v. Shalala*, 66 F.3d 179, 184 (9th Cir. 1995) (citing
*Andrews v. Shalala*, 53 F.3d 1035, 1043 (9th Cir. 1995).

In November 2012, Dr. Zeigler signed a letter indicating that Needham was her patient at
Old Town Clinic and that she had been "unable to work or pursue work or attend work related

training due to her chronic migraines." Tr. 925. The doctor further wrote that Needham's "migraines are severe and often prevent her from doing activities of daily living for a day or two at a time." *Id.* By way of prognosis, Dr. Zeigler opined, "I expect that there will be no significant improvement to impact a change on [sic] her employment status for at least the next several months." *Id.* The ALJ summarized Dr. Zeigler's note, along with similar notes provided by two other treating medical sources, and accorded them "little weight," finding that the opinions were (1) on an issue reserved to the Commissioner, (2) based on subjective complaints, and (3) the opinions were not supported by "objective findings or laboratory tests." Tr. 31.

Needham first argues that the ALJ erred in rejecting all of the medical sources' opinions in one fell swoop because by not weighing the opinions individually, the ALJ's reasoning was manifestly not specific and legitimate. Pl.'s Br. 5; Pl.'s Reply 3. The court does not find this reasoning persuasive, however, as the most straightforward explanation for the ALJ's finding is that he intended to accord each of the opinions "little weight," and each for the same reason. Accordingly, the ALJ's assessment of the opinions was not erroneous for that reason alone.

Needham next argues the ALJ erred in rejecting Dr. Zeigler's opinion because it was a conclusory statement on the ultimate issue of disability, which as a legal determination, is a matter reserved to the Commissioner. Indeed, the determination of disability "is for the Social Security Administration to make, not a physician." *McLeod v. Astrue*, 640 F.3d 881, 884 (9th Cir. 2011). Nevertheless, "a treating physician's evaluation of a patient's ability to work may be useful or suggestive of useful information," and the ALJ must at least consider such an opinion. *Id.* at 885. Here, the ALJ considered Dr. Zeigler's opinion, and to the extent Dr. Zeigler opined that Needham was unable to work or pursue work, the court agrees that the ALJ was within his authority to reject that opinion. *Id.* at 884. However, the ALJ's rejection of Dr. Zeigler's

opinion regarding Needham's ability to work does not suffice as a specific and legitimate reason to reject Dr. Zeigler's second opinion, that Needham's migraines were severe and affected her ability to perform ADLs for one or two days afterward.

Needham also assigns error to the ALJ's second rationale for rejecting Dr. Zeigler's opinion: that is was not supported by objective medical findings. In support, Needham references a 2011 District of Oregon case, in which the court ultimately affirmed the ALJ, but noted that, similar to psychological impairments, migraines are not susceptible to detection and quantification by laboratory testing and/or medical imaging, *Mehrnoosh v. Astrue*, *available at* 2011 WL 2173809, at *7 (D. Or. June 2, 2011). Rather, argues Needham, migraines are evinced by the observations of physical manifestations of pain by treating physicians, ongoing treatment, medical history, and signs and symptoms such as nausea, vomiting, photophobia, dizzy spells, and blackouts. *Id.*

Needham's argument is persuasive. Although the ALJ discredited Dr. Zeigler for failure to identify objective evidence to support her opinion, the ALJ did not explain what type of objective evidence would have been required or useful in corroborating the strength and nature of Needham's migraines, nor is the court aware of any "objective findings" or "laboratory tests" that are accepted as useful in diagnosing or quantifying migraines. Rather, the ALJ infers that Dr. Ziegler's opinion was not probative because it was overly reliant on Needham's "own self-reports." However, the ALJ's logic is contradicted by the Act itself. As the ALJ discussed in his decision, a claimant may meet one of the presumptively disabling listings for migraines that meet the criteria of 20 C.F.R. Part 404, Subpart P, Appendix 1 § 11.03 by showing they are "documented by a detailed description of a typical headache event pattern, including all associated phenomena . . . for example, premonitory symptoms, aura, duration, intensity,

accompanying symptoms, and treatment." Tr. 25 (internal quotation marks omitted).
Additionally, in order to meet listing § 11.03, the migraines must occur more than once per week
despite three months of prescribed treatment. *Id.* The ALJ ultimately found Needham did not
meet the listing at step three of the evaluation process because her migraine frequency was once
per week (while using prescribed medication), rather than more than once per week. Tr. 26.
Crucially, however, the ALJ did not find that any other "objective medical evidence" was
lacking. Tr. 26.

Indeed, nowhere does listing § 11.03 require any type of "objective findings" or
"laboratory tests" that are absent from the administrative record in this case. Aside from the
frequency requirement, Needham's medical record includes evidence of all the other components
necessary to meet the listing: numerous ER visits for treatment of migraines, numerous chart
notes discussing treatment of migraines during planned office visits, history of exposure to a
wide variety of medications prescribed for migraine treatment, and history of telltale signs and
symptoms of migraines including nausea, vomiting, fatigue, and sensitivity to light. *See, e.g.*, Tr.
809, 1025, 1094. Dr. Zeigler was familiar with Needham's signs and symptoms, and
recommended that she track episodes in a headache diary, which Needham eventually did, and
which was made part of the record. Tr. 379-405, 442-53, 910. The diary corroborates Dr.
Zeigler's statement that migraines impact Needham's ability to perform ADLs, as she is often
relegated to her bedroom during and after a migraine. Based on the foregoing, had the ALJ
found Needham experienced more than one migraine per week, he presumably would have found
her presumptively disabled under § 11.03. Accordingly, by the Commissioner's own standards,
the signs and symptoms discussed in *Mehrnoosh*, and present on this record, are generally
sufficient clinical evidence to establish a disabling migraine condition.

Because the reasoning set forth in *Mehrnoosh* is persuasive, and because Needham's medical history includes the clinical signs and symptoms associated with diagnosing and assessing migraines, the ALJ's determination that Dr. Zeigler's opinion was not supported by objective evidence is erroneous, at least in regards to the severity and functional effect of Needham's migraines. The Commissioner argues that the record includes objective evidence of improvement with gabapentin. However, despite Needham's improvement she continued to experience migraines once per week, through the date of the hearing. As such, the rationale is not supported by substantial evidence.

The ALJ also implied that Dr. Zeigler and the other treating physicians' opinions were clouded by their "attempt to assist a patient with whom he or she sympathizes with for one reason or another." Tr. 31. The Commissioner declines to defend this finding, and absent any specific evidentiary support, the rationale fails to meet the requisite specific-and-legitimate legal standard. Finally, the Commissioner argues that any errors in the ALJ's assessment of Dr. Zeigler's opinion were harmless, because the opinion included the statement that "there will be no significant improvement to impact a change in [Needham's] employment status for at least the next several months." Tr. 925. However, the argument fails because Needham continued to require ongoing treatment for the migraine symptoms discussed after Dr. Zeigler's letter was written, through the hearing date. *See* Tr. 1056, 1073, 1094.

For all of the foregoing reasons, the ALJ erred in rejecting Dr. Zeigler's opinion as to the nature and severity of Needham's migraines.

## III.    Lay Witness Testimony

Needham assigns error to the evaluation of her mother's testimony. Lay witness testimony regarding the severity of a claimant's symptoms or how an impairment affects a

claimant's ability to work is competent evidence that an ALJ must take into account. *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996). In order to reject such testimony, an ALJ must provide "'reasons germane to each witness.'" *Rounds v. Comm'r*, 807 F.3d 996, 1007 (9th Cir. 2015) (quoting *Molina v. Astrue*, 674 F.3d 1104, 1007 (9th Cir. 2012); (remaining citation omitted)). Further, the reasons provided must also be "specific." *Taylor v. Comm'r of Soc. Sec. Admin.*, 659 F.3d 1228, 1234 (9th Cir. 2011) (citing *Bruce v. Astrue*, 557 F.3d 1113, 1115 (9th Cir. 2009)). However, where the ALJ has provided clear and convincing reasons for rejecting the claimant's symptom testimony, and the lay witness has not described limitations beyond those alleged by the claimant, the ALJ's failure to provide germane reasons for rejecting lay testimony is harmless error. *Molina*, 674 F.3d at 1122.

In two separate written statements submitted with Needham's disability applications, Peters explained that during migraine episodes, her daughter is bedridden and unable to perform ADLs. Tr. 294-95, 436. Peters also indicated that Needham's migraines render her unable to "hold down" full-time work, but felt she was capable of part-time work. Tr. 298, 301, 435, 437. She further explained that Plaintiff's "cognitive problems" are a major barrier for her ability to work. Tr. 299, 435. The ALJ summarized the written statements by Peters with some ambivalence, indicating that he found her credible, but also not persuasive. He accorded Peters' statements "some weight." Tr. 32.

In support of his finding, the ALJ provided three boilerplate reasons for not according Peters' statements full evidentiary weight: (1) they were based on casual observation, rather than objective medical examination and testing, (2) they were "potentially influenced by family loyalties," and (3) they were not credible "for the same reasons . . . that the claimant's allegations are less than wholly credible." Tr. 32. Each of the reasons provided is erroneous. First, as set

forth in the legal standard above, lay witnesses are competent witnesses *because* their observations may provide insight into a claimant's level of impairment, particularly in cases where the "objective" medical evidence does not fully explain the symptoms. *See, e.g.*, *Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987). Second, the ALJ's assumption that Peters' statements were influenced by her familial relationship, in the abstract, is erroneous. *See Dale v. Colvin*, 823 F.3d 941, 944-45 (9th Cir. 2016); *Bruce*, 557 F.3d at 1116. Third, because the ALJ erred in evaluating the credibility of Needham's symptom testimony, his reliance on that rationale is inadequate to support his finding as to the lay witness testimony. These errors were not harmless to the extent they corroborated Needham's testimony and the opinions provided by the treating physicians in support of the nature and severity of Needham's symptoms and her purported inability to work full-time. Therefore, the ALJ's finding as to Peters' lay witness statements should be rejected.

## IV.    Step Three Finding

Needham argues that the ALJ erred in finding she did not meet listing § 11.03 at step three of the sequential evaluation process. As explained above, to meet listing § 11.03 for migraines, a claimant must show a typical migraine pattern, including all associated phenomena, more frequently than once per week, despite at least three months of prescribed treatment. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.03.[4] The ALJ concluded that, based on the medical record, Needham's migraines did not occur more frequently than once per week. Tr. 25.

Needham concedes that her migraines occur once weekly, but argues that because "each migraine lasts from one to three days at a time, which is an average of two days a week in which

---

[4] The Social Security Administration's Program Operations Manual ("POMS") has been revised since the ALJ's decision was rendered. Def.'s Br. 17 n.51. However, the change is not material to the issues herein.

she was experiencing a migraine[,]" she nevertheless meets the frequency requirement of listing § 11.03. Pl.'s Br. 19. While the court acknowledges Needham's contention, the express language of the listing is not ambiguous, and the ALJ's evaluation of the record and application of listing § 11.03 was reasonable and based on substantial evidence in the record. *See, e.g.*, *Batson*, 359 F.3d at 1193. As such, the ALJ did not err in finding that Needham did not meet listing § 11.03 because she does not have more than one migraine per week following at least three months of treatment.

## V.      RFC Formulation

The RFC is the most a claimant can do despite the functional limitations arising from their medically determinable impairments. 20 C.F.R. §§ 404.1545, 416.945. Because the ALJ erred in evaluating Needham's symptom testimony, the medical opinion of Dr. Zeigler, and Peters' lay witness testimony, the ALJ's RFC formulation, at least regarding Neehdam's production and attendance, was not based on substantial evidence. As discussed below, properly crediting this testimony mandates a finding that Needham is disabled. Accordingly, this court need not, and does not discuss the other assignments of error related to the ALJ's RFC findings.

## VI.     Remand

When a court determines the Commissioner's ultimate disability decision includes legal error and/or is unsupported by substantial evidence, the court may affirm, modify, or reverse the decision by the Commissioner "with or without remanding the case for a rehearing." 42 U.S.C. § 405(g); *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1099 (9th Cir. 2014). Here, the ALJ failed to provide legally adequate reasons to discredit Needham's symptom testimony, portions of the opinion of Dr. Zeigler, and the testimony of the lay witness.

In determining whether to remand for further proceedings or immediate payment of benefits, the Ninth Circuit employs the "credit-as-true" standard when the following requisites are met: (1) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, (2) the record has been fully developed and further proceedings would serve no useful purpose, and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the plaintiff disabled on remand. *Garrison*, 759 F.3d at 1020. Even if all of the requisites are met, however, the Court may still remand for further proceedings, "when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled[.]" *Id.* at 1021. "Serious doubt" can arise when there are "inconsistencies between the claimant's testimony and the medical evidence," or if the Commissioner "has pointed to evidence in the record the ALJ overlooked and explained how that evidence casts into serious doubt" whether the claimant is disabled under the Act. *Dominguez v. Colvin*, 808 F.3d 403, 407 (9th Cir. 2015) (citing *Burrell*, 775 F.3d at 1141 (internal quotation marks omitted)).

As explained above, the first requisite of the *Garrison* test is met, as the ALJ's evaluations of testimony and medical opinion included material errors. The next question, then, is to determine if further proceedings would be useful because either the record requires further development, or serious doubt remains as to whether Needham is, in fact, disabled under the Act. The Commissioner argues that further proceedings are required because there was "relative control" of Needham's migraines by 2011, Dr. Zeigler's opinion did not address Needham's functional capacity before she began treatment in 2012, and because conflicting medical evidence casts doubt over Needham's disability status. Def.'s Br. 20. Needham responds that the record is complete, that there are no material conflicts in the medical evidence, that her

migraines are sufficient to equal listing §11.03, and that the improperly discounted testimony and medical opinion should be credited as true.  Pl.'s Reply 12-13.

On this record, there is little dispute that through the date of the ALJ hearing, Needham continued to suffer from migraine headaches on a weekly basis, even when properly taking her prescribed medication.  *See* Tr. 1083 (although medication helps Needham avoid ER treatment, she continues to have one migraine per week).  Although the Commissioner contends that Dr. Zeigler only began treating Needham in 2012, the record unequivocally reflects treatment of Needham's migraines as early as fall of 2009.  Tr. 502-3, 694-95.  The headaches persisted throughout 2010, were frequent in 2011 and 2012, and only tapered off to one migraine per week in 2013.  *See* "Medical Background," *supra.*  The court acknowledges that although Needham testified that her migraines can leave her incapacitated and in bed for days at a time, the record also reflects that with the assistance of IV fluid and pain medication, Needham often appears to be able to recover from her migraines in a matter of hours, rather than a matter of days as Dr. Zeigler opined in November 2012.  Tr. 925.  Even so, the VE testified that if a hypothetical worker missed work twice per month or had to leave work unexpectedly at a frequency of two times per month, sustained, competitive employment would be precluded.  Tr. 61.  In other words, if the Needham's migraines were expected to cause her to miss or leave work early more than one day per month on average, she is disabled under the Act.  *Id.*

On this record, and even assuming that a portion of Needham's migraines would occur when Needham was not working, four debilitating migraines per month – each requiring some recovery time and possible medical treatment – would almost certainly result in time loss more than once per month.  Indeed, the parties do not dispute that despite Needham's attempt to work at a bakery, her employment was terminated because migraines caused her to miss work—in that

case, three times in one month.  Tr. 804, 892.  Accordingly, the court need not reach the questions of whether to fully credit the symptom allegations of Needham and the lay witness, and the medical opinion of Dr. Zeigler, because the undisputed facts of record, in conjunction with the testimony of the VE, direct a finding of disabled.

The Commissioner's contrary arguments do not create serious doubt as to this outcome. The Commissioner's contention that Needham was insured under Title II through March 31, 2010, may be accurate, but the record reflects her migraines began before that date.  The Commissioner's assertion that there was "relative control" of Needham's migraines by late 2011 is squarely contradicted by treatment records in 2012 and thereafter, which show migraines one to three times per week.  As explained above, although Dr. Zeigler did not opine as to Needham's condition prior to 2012, Needham's medical record clearly evinces the existence of frequent migraines dating back to late 2009, at minimum.  The Commissioner further argues that additional proceedings are needed to further develop the record and clarify ambiguities, but does not identify any issues that would potentially mitigate the disabling effect of Needham's four migraines per month, in conjunction with the VE's assessment.

Moreover, because the Commissioner has not identified any remaining issues that require clarification or further development, the court should credit as true all improperly discredited evidence, including Needham's symptom allegations, the lay witness statements, and Dr. Zeigler's opinion regarding the severity of the migraines.  *Garrison*, 759 F.3d at 1020.  Crediting the evidence as true, no reasonable ALJ could find Needham not disabled.  Accordingly, the proper disposition of this case is reversal of the Commissioner's final decision and remand for benefits.

## RECOMMENDATION

For the reasons discussed above, the Commissioner's decision should be

REVERSED and REMANDED for immediate calculation and payment of benefits.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if

any, are due Tuesday, August 22, 2017. If no objections are filed, then the Findings and

Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a

copy of the objections. When the response is due or filed, whichever date is earlier, the

Findings and Recommendation will go under advisement.

DATED  August 8, 2017.


_____
/s/ Youlee Yim You
Youlee Yim You
United States Magistrate Judge